**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case: 1:26-mj-00205<br>Assigned To : Upadhyaya, Moxila A.<br>Assign. Date : 11/10/2026<br>Description: COMPLAINT W/ARREST WARRANT |
| **v.** | : | |
| | : | **Filed Under Seal** |
| **SHAWN DMITRIUS LIGHTFOOT,** | : | |
| | : | |
| **Defendant.** | : | |

**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Postal Inspector Alexander F. Rubio, being duly sworn, state:

1. This affidavit is made in support of a criminal complaint charging SHAWN DMITRIUS LIGHTFOOT ("LIGHTFOOT") with one count of Bank Fraud, in violation of 18 U.S.C. § 1344(2), one count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A, and one count of Financial Exploitation of an Elderly Person, in violation of 22 D.C. Code § 933.01, subject to the Senior Citizen Victim enhancement under 22 D.C. Code § 3601.

2. This affidavit is also submitted in support of an arrest warrant for LIGHTFOOT.

3. As detailed below, there is probable cause to believe that LIGHTFOOT engaged in a systematic scheme to defraud his neighbor, a 78-year-old disabled Veteran ("VICTIM"), whose primary source of income was disability payments from the U.S. Department of Veterans Affairs. As part of the fraud scheme, LIGHTFOOT obtained access to the VICTIM's financial accounts, opened credit card accounts in the VICTIM's name, and used the VICTIM's funds to finance LIGHTFOOT's businesses, stealing approximately $150,000.00.

4. This affidavit outlines your Affiant's background and sets forth evidence establishing probable cause to believe that LIGHTFOOT committed the above offenses.

## I. AFFIANT'S BACKGROUND

5. I am a U.S. Postal Inspector with the U.S. Postal Inspection Service ("USPIS"). I have held this position since January 2025. I attended Basic Inspector Training where I received instruction on conducting criminal investigations for crimes involving the U.S. Postal Service ("USPS"). I am currently assigned to the Washington Division's Capital Mail Theft and Violent Crimes Team. My responsibilities include investigating mail theft, identity theft, and other criminal activities affecting the USPS, its employees, and the people who rely on its services.

6. I base the facts set forth in this affidavit upon my personal knowledge, information obtained during my participation in this investigation, review of documents, knowledge obtained from other individuals, including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein.

7. This affidavit is not intended to include every fact and matter observed by me or known to the government relating to this investigation. Instead, this affidavit contains only those facts which are necessary to establish that probable cause exists to issue an arrest warrant.

## II. RELEVANT INDIVIDUALS AND ENTITIES

8. The VICTIM is a lifelong resident of Washington, D.C., who honorably served in the U.S. Army from 1966 through 1969. Following his initial training at Fort Jackson, South Carolina, he later served in Vietnam from 1967 to 1968, participating in multiple combat missions. During one of these combat missions, the VICTIM sustained combat-related injuries. Because of the wounds that the VICTIM received during the course of his honorable service, the VICTIM was awarded the National Defense Service Medal, the Vietnam Service Medal, and the Purple Heart. Furthermore, due to those service-connected injuries, the VICTIM received VA disability benefits that were deposited into a financial account affected by the scheme described herein.

9. The U.S. Department of Veterans Affairs ("VA") is a federal agency dedicated to providing lifelong healthcare, benefits, and cemetery services to military veterans and their dependents. Through its Veterans Benefits Administration, the VA administers monthly, tax-free disability compensation payments to Veterans who suffered injuries during their military service.

10. LIGHTFOOT is the owner of several businesses, including Das Food Consulting Group LLC ("Das Food"), Artdrenaline Catering LLC ("Artdrenaline"), and Let-Us LLC ("Let-Us"). LIGHTFOOT lived next door to the VICTIM and, as described below, gained access to the VICTIM's finances, mail, and identifying information. The investigation has also established that LIGHTFOOT used that access to obtain financial products and conduct transactions in the VICTIM's name, while directing funds and purchases to LIGHTFOOT's businesses.

11. B.F., a former employee of LIGHTFOOT, received payments originating from the VICTIM's financial accounts. B.F. later provided investigators with statements and electronic communications linking LIGHTFOOT to the use of the VICTIM's accounts, including a photograph of the VICTIM's debit card and instructions concerning a business payment.

12. C.M. was a USPS letter carrier assigned to the route serving the VICTIM's apartment building. Because both the VICTIM and LIGHTFOOT resided in the building, C.M. became familiar with their mail-delivery practices. As described below, C.M. provided information indicating that LIGHTFOOT had the ability to access the VICTIM's mail.

13. Records obtained during the investigation established that several of the financial institutions used in the scheme were federally insured financial institutions, including CREDIT UNION 1, as well as BANK 1, BANK 2, BANK 3, BANK 4, BANK 5, and BANK 6. Records from these institutions revealed accounts opened using the VICTIM's identifying information, unauthorized transactions, and account activity associated with LIGHTFOOT.

## III. PROBABLE CAUSE

### a. CREDIT UNION 1 Reports LIGHTFOOT's Exploitation of the VICTIM

14. On or about May 10, 2024, the Metropolitan Police Department ("MPD") received a report from CREDIT UNION 1. The report indicated that LIGHTFOOT was financially exploiting his neighbor, the VICTIM, through debit-card and credit-card fraud transactions.

15. According to CREDIT UNION 1, LIGHTFOOT lived next door to the VICTIM and was suspected of stealing debit and credit cards from the VICTIM's mail to conduct unauthorized transactions and withdrawals of the VICTIM's funds. CREDIT UNION 1 further reported that the VICTIM's identity had been used to open accounts at financial institutions, and that funds from the VICTIM's accounts were used to make payments to businesses associated with LIGHTFOOT, including Artdrenaline and Das Food. CREDIT UNION 1 also observed that fraudulent transactions repeatedly appeared after replacement cards were issued to the VICTIM.

16. CREDIT UNION 1 further reported that on or about January 31, 2024, in Alexandria, Virginia, two VA compensation checks made payable to the VICTIM were deposited into the VICTIM's checking account using the VICTIM's debit card.

17. CREDIT UNION 1 also provided your Affiant with a recorded phone call on or about May 25, 2025. In the call, LIGHTFOOT falsely represented that he was the VICTIM. As described below, records established that the VICTIM was hospitalized at the time of the call.

18. During the call, LIGHTFOOT could not pass the verification process. For example, LIGHTFOOT did not know the correct email on the account and also provided his own phone number (XXX-XXX-5545). The representative advised LIGHTFOOT to send a visual verification of his identity, which would require receiving a link via text-message to prompt the caller to upload a photo of himself. LIGHTFOOT refused and terminated the call.

**b. Interview of LIGHTFOOT**

19. On September 23, 2026, your Affiant approached LIGHTFOOT for an interview at his coffee shop in Washington, D.C. LIGHTFOOT stated the following in sum and substance.

20. LIGHTFOOT was asked whether he ever called CREDIT UNION 1 on the VICTIM's behalf. Investigators played the recording of the call made from phone number XXX-XXX-5545 to CREDIT UNION 1 inquiring about one of the VICTIM's accounts. LIGHTFOOT stated that the VICTIM was with him when he made the call. LIGHTFOOT also confirmed that it was his voice on the recording. LIGHTFOOT further stated that at the time of the phone call, he was likely in the VICTIM's apartment in Washington, D.C.

21. LIGHTFOOT provided phone number XXX-XXX-5545 as his mobile number. Records obtained from BANK 1, BANK 2, BANK 3, BANK 4, and BANK 5 reflected that XXX-XXX-5545 was listed as contact information for accounts opened in the VICTIM's name.

22. LIGHTFOOT told investigators that he assisted the VICTIM with opening a bank account at BANK 6, further adding that he would assist the VICTIM with getting to the bank, assist with transactions, and bring the VICTIM back home. LIGHTFOOT also stated he had assisted the VICTIM with ATM withdrawals and paying utilities. LIGHTFOOT stated that the VICTIM's information was listed on the bank accounts with which he assisted the VICTIM.

23. LIGHTFOOT was asked about his (LIGHTFOOT's) phone number and email address being on a credit card application with the VICTIM's name. LIGHTFOOT stated that he and the VICTIM set that credit card up for the VICTIM, and LIGHTFOOT's phone number and email address were included so that LIGHTFOOT could take care of the account.

24. LIGHTFOOT denied knowledge of any BANK 1 and BANK 2 credit cards.

25. LIGHTFOOT also stated that he had assisted the VICTIM with his mail.

**c. Interview of the VICTIM**

26. Your Affiant interviewed the VICTIM on multiple occasions. The VICTIM explained that he lived alone, that LIGHTFOOT was his neighbor, and that LIGHTFOOT had assisted him with housing matters, banking, and other personal affairs.

27. Although the VICTIM initially could not recall LIGHTFOOT's name during the interview, the VICTIM did confirm that LIGHTFOOT resided in the apartment across the hall from the VICTIM's apartment.

28. The VICTIM indicated that he did not call CREDIT UNION 1 on May 25, 2025. According to the VICTIM and my review of VA records, in or around December 2024, the VICTIM began to experience health concerns that required admission at a VA Medical Facility. In or around January 2025, the VICTIM was released and then readmitted the following month in or around February 2025. The VICTIM remained at the facility up to the time that LIGHTFOOT called the CREDIT UNION 1 on May 25, 2025. The VICTIM continues to reside at the facility.

29. The VICTIM stated that he provided his personal identifying information to LIGHTFOOT after LIGHTFOOT stated that he worked for a homeless shelter and offered to assist the VICTIM with housing matters. The personal identifying information that the VICTIM provided LIGHTFOOT included information capable of being used to access financial accounts and apply for financial products.

30. The VICTIM advised that LIGHTFOOT encouraged him to open an account at BANK 6 account and that LIGHTFOOT accompanied the VICTIM when the account was opened.

31. The VICTIM further advised that he began experiencing unauthorized activity involving his financial accounts while residing next door to LIGHTFOOT after LIGHTFOOT opened a food business.

32. Throughout the investigation, the VICTIM denied authorizing LIGHTFOOT to access his financial accounts, denied applying for the credit card accounts, and denied making numerous transactions reflected in financial records. The VICTIM also denied ever going to Alexandria, Virginia to deposit a VA compensation check.

33. The VICTIM further denied authorizing transactions that benefited businesses associated with LIGHTFOOT, including Das Food, Artdrenaline, and Let-Us, as well as transfers and withdrawals identified through the investigation.

34. The VICTIM further reported that his mailbox was secured by a key and that the VICTIM observed LIGHTFOOT remove mail from the VICTIM's mailbox on one occasion.

35. The VICTIM also stated that LIGHTFOOT claimed he worked at the apartment, which was false, and claimed to have access to his apartment despite never being provided a key.

**d. Interview of C.M.**

36. Your Affiant interviewed C.M., a USPS Letter Carrier, who was assigned to the route serving the apartment building where both the VICTIM and LIGHTFOOT resided. C.M. was familiar with both individuals.

37. C.M. indicated that building access required entry through a locked door. C.M. further indicated that the mailbox unit was located within the interior of the building, was never observed to be unsecured, and that access to individual mailboxes required a key.

38. C.M. also advised that there were occasions when C.M. informed LIGHTFOOT that the VICTIM's mailbox was full. After providing that information to LIGHTFOOT, the VICTIM's mailbox would routinely be empty when C.M. returned several days later.

39. C.M. further advised that C.M. never provided LIGHTFOOT the VICTIM's mail. C.M. further stated that LIGHTFOOT never asked for delivery of the VICTIM's mail.

**e. Interview of B.F.**

40. Your Affiant interviewed B.F., a former associate of LIGHTFOOT, who received multiple payments originating from the VICTIM's accounts.

41. B.F. advised that LIGHTFOOT repeatedly represented that B.F. would be paid from the VICTIM's account for work performed on LIGHTFOOT's behalf.

42. B.F. provided text messages exchanged with LIGHTFOOT, including a photograph of the VICTIM's CREDIT UNION 1 debit card and instructions relating to a business payment.

43. According to B.F., he did not initially believe the payments were improper because he understood LIGHTFOOT to have access to, and authority over, the VICTIM's finances as a potential business partner of LIGHTFOOT.

**f. Financial Records**

44. Your Affiant has obtained records from CREDIT UNION 1, BANK 1, BANK 2, BANK 3, BANK 4, BANK 5, and BANK 6. Those records indicate that a majority of the VICTIM's income was derived from VA compensation payments.

45. The records reveal that from in or around June 2023 through January 2025, credit card accounts were opened with the VICTIM's name, date of birth, and Social Security number, along with LIGHTFOOT's email address and telephone number.

46. The records also establish that the credit cards were mailed either to the VICTIM's address or LIGHTFOOT's address and that charges from accounts opened in the VICTIM's name were used to purchase goods for Das Food and Artdrenaline.

47. In addition, records reveal payments from the VICTIM's accounts that benefited third parties, including B.F., and transactions involving business vendors. Records from BANK 6, which LIGHTFOOT admitted helping the VICTIM open, show similar activity.

48. Although the VICTIM did not review each transaction in the records because they are extensive, the VICTIM provided a broad overview of legitimate and fraudulent transactions. The VICTIM denied authorizing the transactions described in the preceding paragraphs and indicated that he never provided LIGHTFOOT with permission to access his financial accounts.

49. Your Affiant also obtained the VICTIM's credit reports which reflected five credit card accounts opened in the VICTIM's name at BANK 1, BANK 2, BANK 3, BANK 4, and BANK 5 from in or around June 2023 through February 2025. Some accounts were delinquent and some accounts resulted in charge-offs, which severely impacted the VICTIM's credit score.

50. To date, the total loss amount is approximately $150,000.00.

## IV. CONCLUSION

51. The investigation has established that LIGHTFOOT had access to the VICTIM's personal identifying information, finances, and mail; used the VICTIM's identity to open financial accounts; placed his own telephone number and email address on accounts opened in the VICTIM's name; impersonated the VICTIM during a call with CREDIT UNION 1; directed payments from the VICTIM's accounts to businesses under LIGHTFOOT's control; and caused approximately $150,000 in losses.

52. The recurring use of LIGHTFOOT's telephone number, email address, business entities, and admissions concerning his involvement with the VICTIM's financial affairs demonstrates that LIGHTFOOT conducted the fraudulent activity rather than an unknown third-party or the VICTIM, who denied authorizing such activity.

53. In addition, the records described above establish that LIGHTFOOT obtained credit and other property under the custody and control of federally insured financial institutions by means of materially false and fraudulent pretenses.

54. The records described above also show that LIGHTFOOT knowingly used, without lawful authority, the VICTIM's name, date of birth, and Social Security number to obtain financial products and conduct transactions during and in relation to the bank fraud scheme described herein.

55. The records described above also show that VA disability compensation payments were deposited into the VICTIM's accounts and that LIGHTFOOT subsequently withdrew, transferred, and expended those VA compensation payments without authorization.

56. Based on the foregoing, your Affiant submits that probable cause exists to issue a criminal complaint and arrest warrant charging LIGHTFOOT with one count of Bank Fraud, in violation of 18 U.S.C. § 1344(2), one count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A, and one count of Financial Exploitation of an Elderly Person, in violation of 22 D.C. Code § 933.01, subject to the Senior Citizen Victim enhancement under 22 D.C. Code § 3601.

Respectfully submitted,

______________________________

Postal Inspector Alexander F. Rubio

Respectfully submitted and attested to in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 by telephone on November 10, 2026.

______________________________

HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE